Robert EDWARDS, Jr., an infant, by Jolene Edwards, his next friend (Plaintiff), Respondent,

v.

Viola Lillian DIXON (Defendant), Appellant.

No. 29520.

St. Louis Court of Appeals.

Missouri.

Feb. 5, 1957.

Anderson, Gilbert, Wolfort, Allen & Bierman, Norris H. Allen, St. Louis, for appellant.

Hullverson & Richardson, James W. Jeans, St. Louis, for respondent.

HOUSER, Commissioner.

This is an action for damages for personal injuries sustained by a 9 year old boy who collided with an automobile as he ran across Clark Avenue in the City of St. Louis. Defendant Viola Lillian Dixon appeals from a judgment for $5,000 entered upon a jury verdict. The petition charged six separate assignments of primary negligence and negligence under the humanitarian doctrine. Plaintiff abandoned all assignments of primary negligence and submitted the case to the jury solely on humanitarian failure to stop or slacken speed. On this appeal the question is whether there was sufficient evidence of stopping or slackening time and ability to make a submissible case and to support the giving of plaintiff's verdict-directing instruction.

Clark Avenue, an east and west public street, is 37½ feet wide. Montrose, a north and south street, intersects Clark. East of Montrose vehicles were parked along the north and south curbs of Clark, spaced about a car's length apart. Defendant, age 60 years, was driving her Fleetwood Cadillac automobile in an easterly direction on Clark Avenue east of Montrose at 10:30 a.m. on a clear day in October, 1953. Defendant's estimate of her speed was 10 to 15 m.p.h. A police officer testified that after the collision defendant told him she was going 15 to 20; that when he "pinned down" defendant she fixed her speed at 18 m.p.h. Defendant was glancing around, looking for a place to park. Defendant's friend, Charlesetta Jefferson, was seated in the right front seat of the automobile. Mrs. Jefferson saw plaintiff, Robert Edwards, Jr., coming from north to south, emerge "from the parked car situation," running at a right angle to the street, directly across Clark Avenue into the path of the automobile. Mrs. Jefferson immediately knew that Robert was going to be hit but she did not have time to say anything before

it happened. He was running "fast," "pretty fast for a child of his age," "at a pretty great rate of speed for a boy his size." Robert was looking straight ahead. When Mrs. Jefferson first saw Robert he was not near the north curb but was on a line with the left or south side of the vehicles parked on the north side of Clark Avenue. At the split second Robert emerged from where the cars were parked the Cadillac was about the length of the Cadillac (otherwise fixed in this lawsuit at approximately 18 feet) from the point of impact, according to Mrs. Jefferson. She thought Robert ran in front of a truck parked on the north side of Clark, headed west, but later in her testimony was unable to say whether he was in front "or what" of the truck. She did testify positively that when she first saw Robert he was nearer the left side of the truck than the curb line and that Robert was in the "open part of the street." The left side of the Cadillac as it proceeded east was 12 to 14 inches south of the center of Clark. Defendant first saw Robert when he was 1 to 1½ feet away from her left headlight. Robert was then moving from north to south diagonally, facing southwest. To defendant it seemed as if Robert was "up in the air" when he hit the car; that he was running or leaping or "jumping like." She said that he was "fleet;" that he moved toward her car at a speed "twice as fast as a person walks" or it could have been "more than twice." Defendant testified that she "slapped" on her brakes. The brakes "screeched" and Robert ran into the left front headlight of the Cadillac. The application of the brakes was felt by the passenger. "It was sort of a jolt." The car was brought to a stop "right after that;" it came "to an immediate stop." Robert fell to the pavement, unconscious. Robert's mother saw him lying in the street at a point 20 to 25 feet east of Montrose. She testified that if you had drawn a line across the street from where the boy was lying it would have come out at the back part of the truck parked on the north side of the street.

Robert was curled up, most of his body north of the center of Clark. When the Cadillac came to a stop Robert was lying 6 to 8 feet west of the rear of the automobile. The front bumper was about 25 feet east of the spot where Robert was lying. Broken glass, chrome stripping and debris were found in the street 2 to 3 feet west of the boy, and there were skid marks 2 to 3 feet west of the place where Robert was lying. The debris was located approximately 15 feet south of the south or left side of the line of parked cars on the north side of Clark. Defendant testified that a westbound automobile was approaching, 12 to 15 feet east of defendant at the time of the collision, in its proper lane. The westbound car did not touch or strike Robert and did not stop. There was no obstruction in the street, other than the parked truck and cars spaced as above indicated, to prevent defendant from seeing Robert. After testifying that her vision would encompass a street 36 feet wide defendant stated that at the rate Robert was coming there was nothing to prevent her from seeing him come from either one of the curbs. She testified that the reason she did not see Robert when he left the north curb was that her attention was directed to the right-hand side where she was looking for parking space. Defendant knew that this was a neighborhood of 4-family flats occupied by "lots of children." She was aware that there was a "Caution-Children" sign erected nearby on Clark. The Cadillac was a big heavy model. Its brakes were in "excellent" condition.

Defendant asserts that absent evidence on the question she is entitled to ¾ of a second for reaction time; that neither by direct proof nor reasonable inference did plaintiff establish that defendant had sufficient time or distance within which to stop her automobile and that the evidence does not support the theory that defendant could have slackened her speed and thereby enabled plaintiff to escape injury. The further point is made that the court erred in giving verdict-directing Instruction No. 1,

for lack of evidence to support either charge.

■ (1) Failure to Stop. Considering the evidence in the light most favorable to plaintiff, as we are obliged to do in this case, De Lay v. Ward, 364 Mo. 431, 262 S.W.2d 628, we are of the opinion that plaintiff made a submissible case on failure to stop. Our calculations will be made on the basis that defendant was traveling at a speed of 10 m.p.h., as testified to by defendant. That she was not traveling fast is substantiated by the testimony that the automobile was brought to an "immediate" stop "right after" Robert was struck. Traveling at 10 m.p.h. defendant was moving at a rate of 14.66 feet per second. Traveling at 10 m.p.h. an automobile may be stopped "within a very short space." Davis v. Schroeder, 8 Cir., 291 F. 47, loc. cit. 51. It has been judicially determined that "exclusive of reaction time, an automobile with good brakes, traveling at 10 m.p.h. can be stopped within 9 feet." De Lay v. Ward, supra, 262 S.W.2d loc. cit. 636. In the absence of evidence on reaction time the courts take judicial notice that ¾ of a second is required. At 10 m.p.h. an automobile will travel 10.6 feet in ¾ of a second. The brakes on the Cadillac were excellent. Therefore the jury could find that, traveling at 10 m.p.h. this defendant could have stopped in 19.6 feet, including reaction time, or within 1.37 seconds after the occasion to stop arose. The speed at which Robert ran across the street was not given in miles per hour. There was, however, testimony that he moved toward the automobile *at a speed twice as fast as a person walks*. Following the latest en banc decisions of the Supreme Court on the subject we take judicial notice that " 'the ordinary walking speed of the average man is two or three miles per hour or 2.9 to 4.4 feet per second.' " Bunch v. Mueller, Mo.Sup., 284 S.W.2d 440, 443; De Lay v. Ward, supra, 262 S.W.2d loc. cit. 635. Not only from the evidence, but as a matter of common knowledge, the jury could have found that

Robert's speed was around 5 or 6 m.p.h. The Supreme Court, in dealing with the running speed of a 10 year old girl under similar circumstances stated that, within limits, the jury could determine her speed "as a matter of common knowledge at around 5 or 6 miles per hour," or "7.3 to 8.8 feet per second." Bunch v. Mueller, supra, 284 S.W.2d loc. cit. 445. Accordingly, in our calculations we will regard Robert's speed as 5 or 6 m.p.h. or 7.3 to 8.8 feet per second.

■ Defendant's duty to act arose when Robert came into a position of imminent peril. Robert came into a position of imminent peril when defendant saw, or by the exercise of the highest degree of care could have seen, Robert moving toward the path of her automobile apparently intending to continue into its path and apparently oblivious of its approach. Williams v. Ricklemann, Mo.Sup., 292 S.W.2d 276; Wright v. Osborn, 356 Mo. 382, 201 S.W.2d 935. No witness testified as to Robert's position prior to the time he was seen in line with the south side of the parked vehicles. He first comes into the picture at that place, where we find him running south or southwesterly across Clark Avenue. There is no evidence that he had been running on the north sidewalk, or how he traveled from the north curb to the south side of the parked vehicles or whether he had been standing, walking or running in the space between the north curb and the open westbound traffic lane. We may not speculate concerning his activities or movements prior to the time he emerged from a line even with the south side of the parked vehicle. We do know that at that time he was running and looking straight ahead. The jury could have found that at that time and place Robert was in a position of peril requiring defendant to act to save him from harm. From that point to the point of impact, considering the evidence in the light most favorable to plaintiff, Robert ran approximately 15 feet. At the speed he was traveling this required from 1.7 to

2.05 seconds. This means that, considering the speed at which defendant was driving, defendant's automobile was from 24.9 to 30 feet west of the point of impact at the time Robert came into a position of peril. The jury could disbelieve the testimony of Mrs. Jefferson that defendant's automobile was one car length (18 feet) west of the point of impact at that split second. Mrs. Jefferson saw Robert at the time Robert came into a position of peril. What Mrs. Jefferson saw defendant could have seen, Burgess v. Garvin, 219 Mo.App. 162, 272 S.W. 108, had defendant complied with the duty to keep a vigilant lookout both ahead and laterally ahead. Williams v. Ricklemann, supra; Wright v. Osborn, supra; Hornbuckle v. McCarty, 295 Mo. 162, 243 S.W. 327, 25 A.L.R. 1508. Defendant did not stop within the 24.9 to 30 feet available to her although she could have stopped within 19.6 feet, including reaction time. There was no failure of proof of humanitarian failure to stop.

■■■ (2) Failure to Slacken Speed. This is not an "almost escaping" case. Robert was crossing the path of the Cadillac from the left to the right front of the automobile. Robert and the Cadillac collided at the left front headlight. The entire width of the Cadillac, with the exception of the left front headlight, was south of the point of impact. In order for a slackening of the speed of the Cadillac to have been effective to avoid a collision there must have been such a slackening as to permit Robert to run the width of the entire front of the automobile and to get his body and feet out of the way of the farthest reach of its right front fender and bumper, before it moved across his path. The burden was on plaintiff to show by direct or circumstantial evidence what additional time or distance would have been afforded plaintiff by the slackening of the speed of the Cadillac and to what lesser speed the Cadillac could have been reduced, in the time and distance available. There was no direct evidence of this but there was sufficient circumstantial evidence to make a case of failure to slacken speed. Assuming that the Cadillac was 7 feet wide and allowing an extra foot as a margin of safety, Robert required, at the speed he was traveling, almost exactly one second to negotiate the entire width of the front of the Cadillac and to arrive at a place of safety on its south side. The Cadillac moving at 10 m.p.h. could have been *stopped* within 19.6 feet distance and 1.37 seconds time, after Robert was in a position of imminent peril. Logically, its speed could have been reduced to that of barely perceptible forward movement within the same period of time. Brungs v. St. Louis Public Service Co., Mo.App., 235 S.W.2d 81. If defendant had reduced her speed to 2 m.p.h. within 19.6 feet from the time imminent peril began it would have taken her from 1.76 to 3.4 seconds to travel the remainder of the distance to the point where the collision occurred. The same amount of time would have been allowed Robert to cross the space between the left front of the Cadillac and a place of safety to the right or south of the automobile. Thus Robert would have had 1.76 to 3.4 seconds to run a distance which he could have covered in one second. Had defendant slackened to the lesser speed of 1 m.p.h. the time margin within which Robert could have escaped would have been measurably increased. There was no failure of proof of humanitarian failure to slacken speed.

There was no error in the giving of Instruction No. 1 because both assignments of negligence were supported by sufficient evidence.

Accordingly, the Commissioner recommends that the judgment of the circuit court be affirmed.

PER CURIAM.

The foregoing opinion of HOUSER, C., is adopted as the opinion of the court.

The judgment of the circuit court is, accordingly, affirmed.

ANDERSON, P. J., MATTHES, J., and SAM C. BLAIR, Special Judge, concur.