George A. RITTGERS, Plaintiff-Respondent,

v.

KANSAS CITY TRANSIT COMPANY, Chester A. Lybarger, and Theodore W. McFeders, Jr., Defendants-Appellants.

No. 24660.

Kansas City Court of Appeals.

Missouri.

April 1, 1968.

James Daleo, Tucker, Murphy, Wilson, Lane & Kelly and Richard B. McKelvey, Kansas City, for defendants-appellants.

Roger J. Barbieri, Commodore M. Combs, Jr., Kansas City, for plaintiff-respondent.

JAMES W. BROADDUS, Special Commissioner.

In this action plaintiff, a blind person, sought to recover damages for personal injuries arising from an accident which occurred on March 1, 1965, at or near 215 Pershing Road, Kansas City, Missouri. ·The defendants were the Kansas City Transit Company and its bus driver, Chester A. Lybarger and Theodore W. Mc-Feders, Jr. The jury returned a verdict in favor of defendants Kansas City Transit Company and Lybarger and against defendant McFeders in the amount of $14,000. Judgment was entered in accordance with said verdict. Defendant McFeders has appealed.

Plaintiff offered in evidence a plat prepared by Jerry G. Naylor, a senior draftsman for the Park Department of Kansas City. This plat shows Pershing Road in the area where the Post Office and the old B. M. A. Building are located. The width of a cross-walk shown in the plat was 10 feet. Also a bus stop by the cross-walk was measured as being two feet from the cross-walk. Pershing Road was shown to be 48 feet from curb to curb. The plat also shows lamp posts which were marked with an "X" by Mr. Naylor.

The plaintiff 57 years of age, testified that he had been employed through the Business Opportunities for the Missouri Blind at the cafeteria operated in the main Post Office on Pershing Road since coming to Kansas City on November 4, 1950. He was one of the managers of the cafeteria and traveled to and from work, walking and riding the bus, by himself. In the early morning of March 1, 1965, he left his home at 2627 Lister about 5:10 a. m. and boarded a Kansas City Transit bus at the corner of 27th and Lister. Mr. Lybarger, with whom the plaintiff had ridden for 7 or 8 years, was the bus driver. It was drizzling a little rain, but not enough to wet plaintiff's hair. He wore no hat. The bus, after turning into the Union Station, came back onto Pershing Road at which time the plaintiff stood at the top of the bus front steps with his white cane preparatory to getting off. The bus stopped, the plaintiff got off, reached out and hit a metal upright with his cane. He made a half circle with his cane against the post so that he was facing south. No one got off the bus in front of plaintiff. He didn't notice anyone behind him get off. He couldn't tell if anyone got off the bus at the back door. The bus pulled away, the plaintiff felt the edge of the curb with his foot and stood with his instep on the curb edge so that he would be at right angles. After waiting for some cars to pass which plaintiff heard coming from the east, he stepped off of the curb and started across the street. He reached a point which he presumed to be approximately the middle of the street. He hesitated, that is, stopped completely and turned to face west "to see if he could hear anything coming." He stopped and turned to his right (turned west) at a point he believed to be the center of the street because plaintiff always did that in crossing thoroughfares. Plaintiff did not hear any vehicle approaching from the west. His stopping and turning his head slightly to the right (west) is the last he remembers.

James Aliff, a police officer, testified that on March 1, 1965, he was dispatched at approximately 5:45 a. m. to report to the scene of an accident on Pershing Road in front of the old B. M. A. Building. At the scene he found a man lying in the street bleeding from the head. He ordered an ambulance and requested an accident investigation car to the scene. He further testified that where the man was lying in the street there was a pool of blood about 10 to 12 inches in diameter; that someone brought to him at the scene a white cane. He described the weather that morning as: "Raining hard. It was foggy. Road conditions were slick. It was very bad weather conditions. It was dark at the time." He further testified that visibility was poor and that he proceeded to the scene of the accident slower than normal; that the body as he found it was about half way in the middle of the street between the center line to the south curb line; that he did not know anything about the actual point of impact other than what he was told by the driver of the car as to his estimate as to where the impact occurred.

Zoe Cavanaugh, a police officer in the Accident Investigation Section testified that he talked to defendant McFeders at the accident scene and that defendant told him that he had been eastbound on Pershing Road at about 15 miles per hour and did not realize any danger until he saw a dark object strike his windshield. The witness further testified that McFeders pointed out the apparent point of contact as being about 30 feet east of the cross-walk at that location; that when he arrived at the scene plaintiff was not there; that he found fresh blood on the roadway 14 feet north of the south curb line of Pershing Road. This was 77 feet east of the east line of the marked cross-walk. He measured the cross-walk as being 10 feet wide and Pershing Road as 48 feet wide. He testified it was raining and foggy, it was still dark and the street lights were on. His estimate of the point of impact was based solely on what defendant McFeders told him where he thought the impact took

place. He placed the approximate time of the accident at 5:45 a. m.

Plaintiff called as witnesses five persons who had observed his ability to travel. The first, Mr. Bernard Pruess, District Supervisor of the State Bureau for the Blind, testified that he had known plaintiff for 15 years; that he placed the plaintiff in his job as cafeteria manager at the main Post Office and described the duties of management. He had observed the plaintiff's ability to get around and to travel in a straight line within the past 2 years and before that. Mr. Pruess had observed him move along a sidewalk, moving without holding onto anyone, going wherever he proposed to go, boarding and debarking from public transportation conveyances. He said plaintiff was an adequate traveler with an excellent ability to travel in a straight line once he's given a reference point.

Margaret Brashier had known plaintiff for 10 or 12 years through her work with the Red Cross on volunteer service and had frequently been in his company. She said that he knew his capabilities, could cope with the situation when going through doors and traveling steps.

William J. Mowbray had a tavern about half a block south of where the plaintiff lived and had known him about 4½ years. He knew the plaintiff when he lived alone and took care of himself. He saw plaintiff carry a load of personal belongings under his arm over a period of time when he was moving from one address to another near by. He traveled without difficulty and unerringly to his destination.

Clarence A. Kirkpatrick had known the plaintiff 4 or 5 years since meeting him at the State Convention of the Progressive Blind. On numerous occasions he had observed his ability to move around and to direct himself. He was very active and able to move about at social gatherings, including the ability to seek out another blind person on a dance floor, and when the dance was concluded, return his partner to where he had picked her up, make two or three stops and return back to where he originally was. Witness Kirkpatrick said that the plaintiff had "a perfect sense of direction," and, "unless you knew he was blind, you would never realize he wasn't a fully-sighted person."

William J. Crowe, for 19 years the director of the Kansas City Association for the Blind, had known the plaintiff for about 15 years. He had observed the plaintiff on an average of once a month for the past 9 years. Mr. Crowe, after describing the variety of circumstances in which he had known and worked with the plaintiff, called him one of the outstanding travelers among the blind in Kansas City. His sense of direction was excellent.

Plaintiff offered the following from defendant McFeders' deposition:

"Q. On March 1, 1965, when this accident occurred, what was the mechanical condition of that car? A. Good. Q. How were the brakes? A. Good. Q. How was the windshield on that car? A. Clear. Q. No breaks in it or mars on it that would keep you from seeing out of it well? A. No. Q. How about the windshield wipers? A. Good and operating. Q. Did you have it (them) operating that morning? A. Yes, sir. Q. Did you have your lights on? A. Yes, sir. Q. And how were your lights, were they in good operating condition? A. Yes, sir, in good operating condition. Q. Did you have them on low beam or high beam? A. Low beam. Q. How far in front of you could you see with your lights on low beam? A. Approximately 30 feet. Q. Was it foggy that morning? A. A slight fog. Q. Was there anything other than your windshield that would keep you from being able to see clearly out of the front of the windshield. A. No, sir. Q. Well, is there any reason why you could not see Mr. Rittgers out there in the street? A. No reason. Q. You didn't see Mr. Rittgers make any movement walking or running prior to

this accident. A. I did not see any prior movement."

Chester A. Lybarger, the bus driver for the Kansas City Transit Company testified that he had been carrying plaintiff for 7 or 8 years and knew he was blind. On March 1, 1965, Mr. Lybarger said that he let plaintiff off of the bus at the regular bus stop immediately across the street to the north of the old B.M.A. Building. The last Mr. Lybarger saw after he closed the bus door, the plaintiff was two or three feet from the curb and was facing south.

Defendant McFeders testified that he went to work in the morning at about 5:20 and that his office was located at 315 Pershing Road at the Main Post Office building. He testified that his normal route after arriving at that area was to go in back of the Post Office to park in a vacant lot, if available, and if no parking was available to turn around and go back to Broadway and then east on Pershing Road to Kessler Road and then south on Kessler Road to find a parking place. He took that same route that morning. That morning, however, he never got to Kessler Road. He was proceeding along Pershing Road at approximately 10 to 15 miles per hour, the condition of his car was good, the windshield was good, the windshield wipers were working, and the weather that morning was cloudy, raining and foggy. The cross-walk is at the west end of the B.M.A. Building and runs at an angle from the northeast to southwest. He never saw the plaintiff on Pershing Road that morning or any other morning. He first saw the plaintiff on the morning of the accident when an object hit his car fender between the front of the car and the windshield on the left side. When this happened he immediately applied his brakes and after his car stopped he got out to see what had happened. He saw a gentleman at the rear of his car, at the side. Visibility that morning directly in front of him was 20 to 25 feet, and he could see to the side, considering the fog, about 18 inches to two feet. And in that 18 inches to two feet and

in that 20 to 25 feet he did not see the plaintiff. His automobile was not damaged in any way that morning by the impact, and the impact of the car did not throw the plaintiff anywhere. On the morning in question he saw no pedestrians in the cross-walk. He had stopped for a stop light on Broadway and Pershing Road before he made his turn into Pershing Road, and after the light turned green he took off from a dead stop and got up to a speed of 10 to 15 miles per hour. The left side of the car was approximately 18 inches south of the center line on Pershing Road. The lighting on Pershing Road where the accident occurred was very poor.

Defendant McFeders' contention is that the court erred in failing to sustain his motion for a directed verdict for the reason that "plaintiff failed to make a submissible case to support his sole submission of negligence against defendant McFeders based upon his failure to maintain a proper lookout."

■ In determining whether plaintiff made a submissible case, we must consider the evidence in the light most favorable to plaintiff, must accord to him the benefit of all supporting inferences fairly and reasonably deducible from the evidence, and must disregard defendant's evidence except insofar as it may aid plaintiff's case. Hildreath v. Key, 341 S.W.2d 601, Mo.App.

■ And, as we have said many times, "negligence is ordinarily a question for the jury. It is always so when different minds might reasonably draw different conclusions from the evidence as given." Gillaspie v. Louisiana & M. R. R. Co., 260 S.W. 547, 549, Mo.App.

■ As stated in the recent case of Weathers v. Falstaff Brewing Corp., Mo. App., 403 S.W.2d 663, 667: "A motorist is under the continuous statutory duty to exercise the highest degree of care at all times and to keep a careful and vigilant lookout for other persons and vehicles on the highway. Section 304.010 R.S.Mo.1959,

as amended, V.A.M.S.; Stradford v. Bluefeather, Mo., 384 S.W.2d 541; Braun v. Hoffmeister, Mo., 366 S.W.2d 406. To fulfill that duty he is required to look in such an observant manner as to enable him to see that which a person in the exercise of the highest degree of care would be expected to see under similar circumstances. Chenoweth v. McBurney, 359 Mo. 890, 224 S.W.2d 114; Witt v. Peterson, Mo., 310 S.W.2d 857. And where one is charged with the duty to look and to look is to see, he must be held to have seen what looking would have revealed. Lilly v. Boswell, 362 Mo. 444, 242 S.W.2d 73; Witt v. Peterson, supra."

■ When viewed in a light most favorable to plaintiff the evidence shows that plaintiff had reached a point near the center of Pershing Road where he stopped and turned his head to the right. Defendant said the lighting at that particular position of Pershing Road was very poor. The jury could have found otherwise, because as shown by the plat introduced in evidence, one of the overhanging street lights was near the south curb line of Pershing Road and within 30 feet of the cross-walk. Defendant also said he could only see ahead a distance of 25–30 feet. When his deposition was taken he said that there was only a "slight" fog. Plaintiff testified that "it wasn't raining very hard," when he got off the bus. The lights of defendant's car were on low beam. Section 304.350 V.A.M.S. provides that lights on low beam shall be arranged and of sufficient intensity as to reveal a person or vehicle at a distance of at least one hundred feet ahead. In the absence of evidence to the contrary it will be presumed that defendant's lights met this minimum standard. Brown v. Wooderson, 362 S.W.2d 525, 529, 99 A.L.R.2d 894, Mo.Sup. The jury was not bound to accept defendant's estimate of the distance he could see ahead. Defendant said the windshield of his car was clear and the windshield wipers were in good condition and operating. When defendant's deposition was taken he was asked this significant question:

*"Well, is there any reason why you could not see Mr. Rittgers out in the street there? A. No reason."*

In support of his contention defendant cites many cases. His two principal cases are Harris v. Lane, 379 S.W.2d 635, Mo. App., and Stegall v. Wilson, 416 S.W.2d 658, Mo.App. In the *Harris* case the plaintiff was a youngster, age 7, who was running at the time he was struck by defendant and about 4 feet in front of defendant's car when first seen. There was no evidence of the width of the street which it was inferred that plaintiff was crossing and no evidence as to when defendant could first have seen plaintiff or if plaintiff could have been seen had the defendant looked. There was no evidence as to where the accident occurred except "near Blackstone." In the *Stegall* case the court gave a lookout instruction under a charge of plaintiff's contributory negligence when the evidence showed that the plaintiff, on a motor scooter, was traveling 10 miles per hour and within 10–15 feet of the defendant when suddenly defendant started backing into plaintiff's traveled lane. On appeal to this court it was held that under such evidence, lacking any suggestion as to what means and ability the plaintiff had to avoid the collision, a lookout instruction was improper.

It would lengthen this opinion to discuss in detail the other cases cited by defendant. They are likewise distinguishable from the instant case.

Giving plaintiff the benefit of every reasonable inference that may be drawn from the evidence in his favor precludes us from holding that he did not make a submissible case on the ground of defendant's failure to keep a proper lookout.

The judgment should be affirmed. Your Special Commissioner so recommends.

**300**

PER CURIAM.

The foregoing opinion by JAMES W. BROADDUS, Special Commissioner, is hereby adopted as the opinion of the Court, and the judgment is affirmed.

All concur.